Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 294 | **DATE** | May 29, 2003 |
| **CASE TITLE** | *United States of America v. Lloyd Baldwin* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10)■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, this Court finds that the Government has met its burden and shown beyond a reasonable doubt all of the elements of section 1343 for all four counts in the Indictment, and therefore, a judgment of GUILTY is entered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAY 3 0 2003 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 45 |
| | Copy to judge/magistrate judge. | | | |
| RTS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
) Hon. Blanche M. Manning
v. ) 99 CR 0294
)
LLOYD BALDWIN, )

## FINDINGS AND CONCLUSIONS

Defendant Lloyd Baldwin was charged in a four-count indictment with devising, intending to devise, and participating in a scheme, from August 1993 to October 1995, to defraud Joseph Piscopo of $3 million dollars by means of false and fraudulent pretenses, representations, and promises transmitted by means of wires in interstate and foreign commerce from Chicago, Illinois to New York, New York (Count I) and from Zurich, Switzerland to Oakbrook, Illinois (Counts II, III, and IV), in violation of 18 U.S.C. §§ 1343 and 2.

On May 12, 2003, having been advised of his right to a jury trial and all related rights, Baldwin waived his right to a jury trial both orally and in writing. Upon the Government's consent to a bench trial and this Court's approval and finding that Federal Rule of Criminal Procedure 23(a) was complied with, this matter was tried before this Court without a jury.

Pursuant to Federal Rule of Criminal Procedure 23(c), after carefully observing the trial and reviewing the transcript and trial exhibits, the Court hereby enters the following written findings of fact and conclusions of law based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that findings of fact may be considered conclusions of law, they will be deemed conclusions of law. Similarly, to the extent that matters expressed as conclusions of law may be considered findings of fact, they will also be deemed findings of fact.

**FINDINGS**

The victim in this case, Mr. Piscopo, who lives in Oak Brook, Illinois, first met Defendant Baldwin in the early 1970's at a computer software trade show. Piscopo was the owner and founder of Pansophic, a software company, while Baldwin was working as a representative for another software company. A few years later, in 1976, Piscopo hired Baldwin as an administrative vice-president at Pansophic, to handle personnel, accounting, and administrative matters. Piscopo testified that based on his dealings with Baldwin, he believed Baldwin was a "very honest" person. After two years, Baldwin left Pansophic on good terms, when his position was downsized.

After Baldwin left Pansophic, it grew into a successful company and in the early 1980's Piscopo sold his interest for $200 million. With the proceeds from the sale of his company, Piscopo became a venture capitalist, investing in start-up computer companies.

Although Baldwin had left Pansophic in 1978, he and Piscopo remained friendly and kept in touch over the years. In 1991, Baldwin asked Piscopo if he would be interested in an investment opportunity that Baldwin was then putting together. Piscopo, however, declined to invest in this venture.

In 1993, Baldwin again contacted Piscopo about an investment opportunity called a "prime bank funding program" ("the Program"). According to Baldwin, the Program involved making short-term loans to unnamed "large-scale" European banks to be kept by the banks as cash reserves. The banks would then be able to make loans for up to $100 for every $1 that they received in reserve. The funds received via the Program, however, would not be lent and would therefore be guaranteed because the money would be kept at the banks. Baldwin contended the

2

Program offered a guaranteed return of 12% (for three weeks) to 36% (for 10 weeks) and that the principal would "never be at risk" because "they were never to leave the bank." Additionally, Baldwin offered a "personal guarantee." Baldwin told Piscopo that at the end of the investment period he could take out his money and that the profit would be "tax-free" because the proceeds would be paid into a trust account in the Cayman Islands. Baldwin stated that to invest in the Program, he needed to raise $40 million and that it was only "available to a select number of individuals."

Although he did not know the specifics of the Program, because of his faith in their 20 year friendship and his belief in Baldwin's honesty, Piscopo agreed to invest 1 million dollars for 9-10 weeks, which was guaranteed to earn him a 36% rate of return. Shortly thereafter, in August of 1993, Piscopo received a facsimile and a proposed joint-venture agreement ("the Agreement") from Floyd Reeves, who Piscopo had never met before. Baldwin told Piscopo that Reeves, who lived in California, was his partner in the Program. Subsequently, Piscopo and Reeves entered into the Agreement, which set out the details of the Program – e.g., principal invested, term, and rate of return. Pursuant to the Agreement, Piscopo had his bank in Chicago wire 1 million dollars to a Spanish Bank to an account in the name of Floyd Reeves.

During the period of Piscopo's investment (August 11 to October 14), Baldwin, who was in Spain and Switzerland, and Piscopo conversed via facsimile. Baldwin represented that the Program had earned Piscopo 40.04% instead of 36%, and therefore, he was looking at receiving $1.404 million. Instead of getting his money back, however, Piscopo agreed to "roll-over" the $1.404 million and to invest an additional 2 million dollars in the Program.

In making the additional 2 million dollar investment, Piscopo entered into a second joint-

3

venture agreement ("the Second Agreement) with the Daric Corporation, a Cayman Island company, set up and controlled by Baldwin. The Second Agreement contained the same terms as the initial Agreement – ten weeks and a 36% rate of return on the 2 million dollars – and stated that the principal was guaranteed by a company call Equity Funding, which was another entity controlled by Baldwin. Subsequently, Piscopo had his bank in Chicago wire 2 million dollars to an off-shore European bank account owned by the Daric Corporation, which was then immediately wired to a bank account controlled by Baldwin in the Cayman Islands.

In January of 1994, near the end of the second investment period, Piscopo sent several faxes to Baldwin stating that he did not wish to reinvest his investment and wanted Baldwin to wire his principal ($3 million) and the return to his account with the Northern Trust Bank in Chicago. Unfortunately, Piscopo never received any of his investment (either the principal or the return). Instead, he was given the runaround by Baldwin for almost a year and a half, at which point Piscopo lost track of Baldwin in October 1995. Up until 1995, Baldwin, via faxes and telephone calls, promised that Piscopo's money was safe but that circumstances beyond his control prevented the return of the investment. These delays were allegedly caused by events such as bank holidays, deaths (such as the death of the fathers of an attorney and a trustee), and legal problems with the banks and accounts where the funds were allegedly being held. In the end, Piscopo never received any of his 3 million dollars let alone his guaranteed return.

The Government's expert witness, a professor of law with a speciality in commercial and financial fraud, after reviewing the documents and the Agreements, testified that the Program had

many of the characteristics of a fraud known as a "prime investment scam."[1] A prime investment scam, like the Program, promises an extremely high rate of return in relation to the risk. The scheme promises that the principal investment is guaranteed because it is designated for reserves at a foreign bank. The professor stated that it is not possible for depositors to instruct banks to keep funds in reserve and that banks do not solicit short-term deposits from private investors to ensure that their reserves are at the required level. Instead, they get short-term loans from other banks and governments, i.e., the Federal Reserve. The professor also testified that persons who operate prime investment scams typically give the same excuses to the victims as to why they cannot return their investment, such as: the foreign banks are closed for holidays and that an important member of the operation, a trustee, is sick or died. Consequently, based on his knowledge and experience, the professor opined that, in his expert opinion, the Program that Baldwin presented to Piscopo has the signature of a prime rate investment scam.

To explain what actually happened to Piscopo's investment, the Government called Joan Colson, who is a CPA and an auditor for the Government. After examining the records from Floyd Reeves' account at the Spanish bank where Piscopo transferred the first 1 million dollars, Ms. Colson testified that at the time Piscopo's money was wired, the account contained only $125.00 and that within a month, by September 2, 1993, over $950,000 was wired to two banks in New York and not to European Banks as Baldwin had promised.[2] Ms. Colson, however, could

---

[1] Although Baldwin did not object to the admissibility of the professor's testimony, the Court finds that it was admissible under FRE 702. See United States v. Robinson, 2002 WL 65239, at *2-4 (S.D.N.Y. 2000) (finding that expert's testimony "regarding the hallmarks of a prime bank fraud scheme" was admissible).

[2] Unless otherwise noted all documents referred to in this opinion were admitted into evidence without objection.

5

not testify where the $950,000 went after it was transferred to New York because the banks had since merged and the documents were no longer available.

Ms. Colson also examined documents and records from a bank in the Cayman Islands. Immediately after Piscopo wired the second investment ($2 million) to a European bank, Baldwin had the 2 million dollars transferred to an account which he controlled in the Cayman Islands, instead of being used to invest with European banks, as promised. Within a year, the entire 2 million dollars was transferred out of the account. Piscopo's money was then paid out to Floyd Reeves and his company Harvest Enterprises and Baldwin's friends, used to pay phone, cable, and credit card bills and the purchase of a truck, and to Mr. Paul Horvath, who was trying to build a hotel in the Cayman Islands.

The Government next called John Mathewson, the chairman of the Cayman Island bank where Piscopo's 2 million dollars were deposited after initially being wired by Piscopo to a European bank.[3] Mr. Mathewson testified that it was common practice for its customers to have money deposited in a bank in the United States and then wired to the Cayman Islands. He also testified that for a fee, the bank would set up "shelf corporations," which were corporations without any assets which the bank customers used to sell to prospective clients. For a small fee, anyone could set up a shelf corporation and the bank would create corporate minutes and supply directors. Mathewson also testified that until recently, Cayman Island bank secrecy laws prevented the disclosure of bank records to law enforcement officials in the United States.

Mathewson, after reviewing documents from his bank, testified regarding Baldwin's

---

[3] The Court notes that although Mr. Mathewson pled guilty to money laundering and tax evasion in a separate proceeding, his testimony was credible because it was supported by bank documents which were admitted into evidence.

6

relationship with the bank. Mathewson testified that he first met Baldwin when he and Yolanda Wong, who later received over $100,000 of Piscopo's 2 million dollars, came into the Cayman Island bank in March of 1993 to purchase a shelf corporation. Subsequently, the bank created the Dewan Corporation, with Baldwin and Wong as the sole shareholders. Baldwin and Wong also obtained credit card accounts for the shelf corporation.

Mathewson testified that on October 17, 1993, the Dewan account received 2 million dollars. This money, according to Mathewson and the bank documents, originated from a wire sent by Piscopo in Chicago. After receiving the 2 million dollar wire, Baldwin, who along with Wong were the only persons with access to the account, systematically emptied the money from the Dewan account. The 2 million dollars went to various locations and people – to Baldwin's friends, to pay credit card debt, and to various other entities and people. Contrary to Baldwin's assurances, there was no evidence that Piscopo's 2 million dollar investment was ever deposited in the reserves of European banks.

In contrast to the Government's case, which consisted of documentary evidence, expert testimony, as well as witnesses with firsthand knowledge of Baldwin's fraudulent activities, Baldwin's defense rested solely upon his own testimony. In an attempt to explain what supposedly happened to Piscopo's $3 million investment, Baldwin took the stand in his own defense. According to Baldwin, when he proposed the Program to Piscopo, he had been working for "a major trust since 1986" and the trust would get money from "select" investors and would then pool that money to invest in the reserves of "major" European banks. Baldwin admitted that he told Piscopo that by investing with the trust, he was guaranteed to earn a 12% to 36% rate of return and that his principal would not be at risk because the money would go from Piscopo to

7

the trust to the reserve of a "major" European bank.

After receiving Piscopo's initial 1 million dollar investment, Baldwin admitted that he told Piscopo that he had earned $404,000 on his investment. According to Baldwin, he knew this information because he had received a fax from Mr. Alegquez, the trustee. Pleased at the success of his initial investment, Baldwin testified that Piscopo then invested an additional 2 million dollars on the same terms.

Unfortunately, Baldwin contends that due to events beyond his control, he was not able to access Piscopo's principal and interest despite using his best efforts to recover the money. Baldwin, however, contends that all of Piscopo's money is safe in a secret and unknown Swiss trust account. Baldwin stated that initially he could not access the money because he could not contact the trustee, who was the only person who could access the trust's funds. Because the trustee was missing, and no one involved with the trust knew where he was, Baldwin contends that the by-laws of the trust provided for the appointment of a new trustee. Before a new trustee could be appointed, however, a complete audit had to been completed by an outside accountant. Unfortunately, because "nobody could move [the] funds," "we couldn't even get a[n] audit." According to Baldwin, since that time he has made every effort to work with the new trustee to "get those moneys back to" Piscopo.

After examining the trial testimony and viewing Baldwin's demeanor, this Court finds that his testimony is not only incredible but borders on the absurd. The documents entered into evidence, many of which were written by Baldwin, the bank records, and Baldwin's lack of knowledge of the details of his excuses completely belittle his version of the events. When asked where the documents and records were to support his version of the events, Baldwin stated that

8

he was required to sign a confidentiality agreement which prohibited him from bringing any trust related documents into the United States. Therefore, Baldwin stated that he left them with an attorney in Geneva, Switzerland. He, however, did not know the name or address of the attorney. Baldwin contends that the new trustee, whom he knew only as "Mr. 24," told him to give the documents to the unnamed attorney. The only person involved with the trust whom Baldwin could specifically identify, the original trustee, who disappeared, was allegedly murdered in a coup attempt in an unknown foreign country.[4]

Baldwin further contends that this new unknown trustee has held up the release of the funds from the Program. The funds, according to Baldwin, including Piscopo's investment, are safely deposited in different European banks. He, however, cannot provide any specific information such as the names of the trusts, banks, or accounts or the names or addresses of any person or entity which has access or knowledge of these accounts.

Likewise, Baldwin's story falls apart when asked to provide details of the trust. He contends that he worked as a "consultant" for the unnamed trust from 1986 to 1994 but cannot specifically articulate what "consulting services" he provided to the trust other than stating that he "introduced people from the trust" to "people from the bank." However, Baldwin could not name any specific persons or banks which he introduced to the trust, other than Piscopo. He did not have any experience or education in financing or banking. Moreover, although he consulted for the trust for almost eight years, he does not have any income to show for it because he alleges that all salary he made from consulting was invested back into the trust.

---

[4] The Court notes that Baldwin's lack of specific information regarding documents and persons related to the trust is very convenient for purposes of trying to explain why he is not at fault for the loss of Piscopo's money.

9

Additionally, when examined in the face of the financial records and documents put into evidence by the Government, Baldwin's story becomes even more implausible. For example, although Baldwin contends that Piscopo's money was invested in the reserves of a "major" European bank and is currently sitting in a bank in Europe, the financial documents and testimony by the Government's auditor and the former president of the Cayman Island bank completely discredits this story. As discussed above, within a month after Piscopo wired the initial 1 million dollars to a Spanish bank, as directed by Baldwin, over $950,000 was wired to two banks in New York and not to European Banks as Baldwin had promised. Additionally, instead of being used to invest with European banks, as promised, Mr. Piscopo's second investment ($2 million) ended up being sent to a bank account controlled by Baldwin in the Cayman Islands. After being transferred to the Cayman Islands, the 2 million dollars went to — among other things — Floyd Reeves and his company Harvest Enterprises, Baldwin's friends, to pay phone, cable, and credit card bills, the purchase of a truck, and to Mr. Paul Horvath, who was trying to build a hotel in the Cayman Islands. Within a year, the entire 2 million dollars was transferred out of the account to which only two people had access – Baldwin and his partner/friend Wong.

Consequently, this Court finds that Baldwin did not invest any of Piscopo's 3 million dollars with European banks, as promised. Instead, he used the money for his own selfish purposes. Whether he did so to help out a friend in need or to invest in a speculative hotel venture does not matter. What matters is that he intentionally put forth a non-existent venture to Piscopo (the Program), knowing that he would use the money for his own benefit and that Piscopo would most likely never get a cent of his 3 million dollars back let alone any return on

10

his investment.

## CONCLUSIONS

Section 1343 provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

The Seventh Circuit has interpreted section 1343 as requiring the Government to prove "a scheme [intent] to defraud, a false representation, and use of interstate communications." United States v. Pritchard, 773 F.2d 873, 876 (7th Cir. 1985).

Baldwin contends that he did not have the requisite intent to defraud at the time he and Piscopo entered into the transactions at issue. According to Baldwin, he made every effort to ensure that Mr. Piscopo's investment would be successful. Therefore, Baldwin contends that he should be found not guilty based on a defense of good faith. The defense of "[g]ood faith, or the absence of an intent to defraud, constitutes a complete defense" to a charge of fraud. United States v. Dunn, 961 F.2d 648, 650 (7th Cir. 1992). To prevail on a "good faith defense," the defendant must show that he had "a genuine belief that the information being sent or given is true." Id.

Here, after reviewing the trial testimony and the documents submitted into evidence and viewing the demeanor of the witnesses and the reasonableness of all of the testimony, this Court finds that the Government has shown beyond a reasonable doubt that Baldwin is guilty of all four counts of wire fraud alleged in the Indictment. As alleged in the Indictment, this Court finds that Baldwin presented Piscopo with a prime bank scam with the intention of defrauding Piscopo.

11

Other than his own self-serving testimony, which the Court finds not credible, Baldwin never had a "genuine belief" that Piscopo's investment would be invested in the reserves of a European bank. Instead, the evidence shows beyond a reasonable doubt that Baldwin intended all along to use Piscopo's money for himself, which was his only intention because there never was any Program to invest in the reserves of European banks.

Likewise, the Government has proven beyond a reasonable doubt that Baldwin perpetrated the fraud by the use of four wires – one for each count. The documents admitted into evidence and the testimony shows that Baldwin caused a 2 million dollar wire transfer to be sent from Chicago to New York (Count I). Likewise, the evidence shows that Baldwin executed his scheme to defraud Piscopo by sending at least four faxes stating false and fraudulent information from Zurich, Switzerland to Piscopo's home in Oak Brook, Illinois (Counts II-IV).

Consequently, this Court finds that the Government has proven beyond a reasonable doubt that Baldwin intended to devise and participate in a scheme, from August 1993 to October 1995, to intentionally defraud Piscopo of 3 million dollars by means of false and fraudulent pretenses, representations, and promises transmitted by means of wires in interstate and foreign commerce from Chicago, Illinois to New York, New York (Count I) and from Zurich, Switzerland to Oakbrook, Illinois (Counts II, III, and IV), in violation of 18 U.S.C. § 1343.

## CONCLUSION

For the foregoing reasons, this Court finds that the Government has met its burden and has shown beyond a reasonable doubt all of the elements of section 1343 for all four counts in the Indictment, and therefore, a judgment of GUILTY is entered.

ENTER:

_____
BLANCHE M. MANNING
U.S. DISTRICT COURT JUDGE

DATE: 5-29-03